


# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NICHOLAS CASSELLI<br>1919 SANDY HILL ROAD<br>PLYMOUTH MEETING, PA 19462 | : CIVIL ACTION NO.<br>:<br>: 13  6279 |
| AND | |
| LAWRENCE LOVE<br>710 BEECH AVENUE<br>GLENOLDEN, PA 19036 | : JURY TRIAL DEMANDED<br>: |
| VS. | |
| CITY OF PHILADELPHIA<br>C/O CITY OF PHILADELPHIA LAW<br>DEPARTMENT<br>1515 ARCH STREET, 14TH FLOOR<br>PHILADELPHIA, PA 19102 | |
| AND | |
| POLICE OFFICERS DETECTIVE GREGORY<br>HOLMAN, STEPHEN REEDER, BADGE #<br>2352, MARK BENZI, BADGE # 2695,<br>SERGEANT BROWN AND CURRENTLY<br>UNNAMED AND UNKNOWN CITY OF<br>PHILADELPHIA POLICE OFFICERS<br>C/O CITY OF PHILADELPHIA LAW<br>DEPARTMENT<br>1515 ARCH STREET, 14TH FLOOR<br>PHILADELPHIA, PA 19102 | |
| AND | |
| AMERICAN POSTAL WORKERS UNION,<br>AFL-CIO PHILADELPHIA, PA AREA<br>LOCAL (APWU)<br>864 MAIN STREET<br>DARBY, PA 19023 | |
| AND | |
| GWEN IVEY<br>864 MAIN STREET<br>DARBY, PA 19023 | |

| | |
|---|---|
| AND | : |
| | : |
| LAURA TILLERY | : |
| 864 MAIN STREET | : |
| DARBY, PA 19023 | : |
| | : |
| AND | : |
| | : |
| FRANK KEENAN | : |
| 864 MAIN STREET | : |
| DARBY, PA 19023 | : |
| | : |
| AND · | : |
| | : |
| UNITED STATES POSTAL SERVICE | : |
| 7500 LINDBERGH AVENUE | : |
| PHILADELPHIA, PA 19176 | : |
| | : |

## COMPLAINT

1. This action is brought pursuant to 42 U.S.C. S 1983. Jurisdiction is based on 28 U.S.C. S 1331 and 1343 (1), (3) (4) and the aforementioned statutory provision. Plaintiffs further invoke the supplemental jurisdiction of this Court to hear and adjudicate state law claims pursuant to 28 U.S.C. S 1367 (a) to hear and adjudicate state law claims.

## PARTIES

2. Plaintiff Nicholas Casselli has an address of 1919 Sandy Hill Road, Plymouth Meeting, PA 19462.

3. Plaintiff Lawrence Love has an address of 710 Beech Avenue, Glenholden, PA 19036.

4. Defendant, the City of Philadelphia is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police Department which employes the named police officers in the caption above and currently unnamed and unknown City of Philadelphia Police Officers referred to in the caption above.

5. City of Philadelphia Police Officers Detective Gregory Holman, Stephen Reeder, Mark Benzi, Detective Brown, and currently unnamed and unknown City of Philadelphia Police Officers are

employees of the City of Philadelphia, and at all times relevant to the averments of this complaint, were acting under color of state law, and are being sued in their official and individual capacities.

6. Defendant American Postal Workers Union, AFL-CIO Philadelphia, PA Area Local (APWU) is a union for postal workers in Philadelphia, and has a business address of 864 Main Street, Darby, PA 19023.

7. Defendant Gwen Ivey is the current president of the APWU and has a business address of 864 Main Street, Darby, PA 19023. She is being sued in her official and individual capacities.

8. Defendant Laura Tillery is the current Chief Steward, Tour 1 of APWU and has a business address at 864 Main Street, Darby, PA 19023. She is being sued in her official and individual capacities

9. Defendant Frank Keenan is/was a steward of APWU and has a business address of 864 Main Street, Darby, PA 19023. He is being sued in his official and individual capacities.

9. Defendant, the United States Postal Service has an address of 7500 Lindbergh Avenue, Philadelphia, PA 19176.

## FACTUAL ALLEGATIONS

10. Plaintiff Casselli is the former President of APWU being duly elected in June 2011 in an election where he ran against Defendant Gwen Ivey.

11. Plaintiff Love is a former officer of APWU (from hereinafter, the "Union") being duly elected in 2011 to the position of Assistant Clerk Craft Director.

12. As former Union Officials, Plaintiffs had access to a filing cabinet in the Union Office at 7500 Lindbergh Avenue, and upon leaving office, they both left personal information and items in the "Union" filing cabinet, which was known or should have been known by Defendants Ivey and Tillery.

13. On/around June 27, 2013, Plaintiff's were given access to the Union Office, and they retrieved their items referred to above, in the presence of a union steward, Defendant Frank Keenan; At

no time were they informed that they were not allowed to do so.

14. On June 27, 2013, Plaintiffs were confronted by Defendants Tillery, regarding a purported investigation that Plaintiffs inappropriately removed documents from the Union filing cabinet, which used to be the cabinet used by Plaintiff Love; this investigation also involved management personnel from the United States Postal Service.

15. Plaintiffs denied any wrongdoing, nor was there any evidence that they removed anything other than their own items from the cabinet – to date, Defendants Ivey and Tillery have never identified any particular item that they claimed was taken from the cabinet, including to Postal Management.

16. The United States Postal Service investigated the incident, including its internal police force, and determined that there was no evidence, which required the need for the matter to be referred to the Philadelphia Police, which it indicated in writing, terming the matter as an internal postal service matter; at the urging of Defendants Ivey and Tillery, Postal Management had the Postal Police search Plaintiff Caselli's back pack – no Union property was found; The Postal Inspection Department also investigated the matter and found no wrongdoing.

17. Defendants Ivey and Tillery had a motive to harm Plaintiffs, due to their stern opposition to what they believed to be their failed leadership of the Union, which was known to Defendants Ivey and Tillery.

18. On/around July 12, 2012, Defendant authored and sent a letter to Plaintiffs' Union Officials, including the "Resident Officer", Executive Board" and its Legal Counsel, accusing them of theft.

19. On/around July 31, 2012, Defendant Keenan made a statement, indicating that he saw no forced entry into a cabinet on June 27, 2012, that he only saw Plaintiff Love, "open the draw".

20. During their investigation, members of the Philadelphia Police Department took photographs of Plaintiffs, which they later showed to the some or all of the Union Defendants, for

for identification purposes.

21. The Philadelphia Police interviewed Plaintiff Love on July 24, 2012, at which time he denied any wrongdoing, including criminal acts; the Philadelphia Police did not interview Plaintiff Casselli.

22. The Philadelphia Police interviewed Defendants Ivey, Tillery and Keenan, and another postal employee, Mr. McKoewn.

23. Defendant Keenan's statements to the Police and to Postal Management contained conflicting information as to what occurred on June 27, 2012.

24. As Union members in good standing, Plaintiffs had every right to be in the Union office on June 27, 2012, without the presence of Defendants; they also had access to their own property contained in the cabinet; as dues paying members they are the partial owners of all Union property, including the cabinet, which Defendant Tillery claimed she owned.

25. On/around July 2012, Defendant Tillery told members of the Philadelphia Police Department that she had not heard anything back yet, "concerning the theft"; she repeatedly referred to what occurred on June 27, 2012, to the Philadelphia Police, Postal Management, Postal Inspection Department and Union officials and Union members, as a theft, including up to the present.

26. In one of the conversations referred to in paragraph 25 above, Defendant Ivey stated that, "a crime was committed but that two men are still working and the files with all the sensitive information are still missing."

27. At no time did Defendant Ivey or Defendant Tillery ever specify any specific document, including a grievance or other alleged sensitive information to the Philadelphia Police, Postal Management, Postal Inspection Department or Union Officials, despite the fact that all grievances are numbered, and can be identified by numbering and the other alleged missing documents would have also been inventoried in some manner.

28. At the time that the Philadelphia Police, including Defendant Holman were investigating Plaintiffs, they were aware that the Postal Service were not pursuing any internal disciplinary action, that it not made any determination that Plaintiffs had committed any wrongdoing, and that it recommended the matter be classified as an internal Postal matter, not a crime.

29. Defendant Tillery specifically stated that files were taken containing grievances, settlements, along with employees' personal information, social security numbers, addresses, telephone numbers; Neither the Union or the Postal Service has used social security numbers for identification purposes, for approximately the last ten years.

30. Defendant Tillery had only been in her Union Position since April 2012, and Plaintiff Love had previously used the filing cabinet for his position and would have had access to all of the information she referred to in paragraph 29 above, up until the time that she took over her position; the same was true for Plaintiff Casselli. who had been the APWU President before Defendant Ivey.

31. All Postal Defendants knew that Plaintiffs were allowed access to all Union offices, as dues paying members in good standing, and that they had not broken into or illegally entered anything.

32. Defendants Ivey, Tillery and Keenan knew that no crime had been committed.

33. Postal Management knew that no crime had been committed, of which information it provided to the Philadelphia Police Department.

34. The Philadelphia Police Department arbitrarily chose to ignore the findings of the Postal Police Department and Postal Inspection Department, and chose to further investigate Plaintiffs, based solely on the unreliable statements of Defendants Ivey, Tillery and Keenan, without any physical evidence that any crime had been committed.

35. During its investigation, the Philadelphia Police Department did not require the Union Defendants to specifically identify any single item which they claimed was stolen.

36. During its investigation, the Philadelphia Police Department did not make any reference to ever physically investigating whether the cabinet in question, had been physically broken into.

37. There is a lack of evidence in the Philadelphia Police Department, that it interviewed anyone from the Postal Management or Postal Police, to determine why they determined the matter to only be an internal Postal matter, for which it did not feel the need to involve the Philadelphia Police; the Philadelphia Police also knew that they lacked jurisdiction to make any arrests regarding any alleged crime committed on United States Postal Service property, for which the sole jurisdiction to make any arrests belonged to federal authorities.

38. There is a lack of evidence that the Philadelphia Police Department reviewed the Union rules regarding who owns Union property, and whether or not dues paying union members in good standing would have access to Union property, including who owned the cabinet in question.

39. On/around August 31, 2012, in a police interview, Mr. McKoewn told the Philadelphia Police that the file cabinet had always had broken lock.

40. The Union Defendants never provided the Philadelphia Police with any motive why Plaintiffs would have taken Union property and it is undisputed that no Union property was found in Plaintiffs' possession or on Postal Service property on June 27, 2012, despite that the Postal Police searched Plaintiff Casselli.

41. Plaintiff Casselli informed the Defendants and Postal authorities that he merely had his own personal property, which had been left in the cabinet, and that he destroyed it on June 27, 2012, by putting it in the Postal recycling bin – there is a lack of evidence that any search of that location was made by the Postal Police or the Philadelphia Police.

42. The Philadelphia Police never documented any motive as to why if they had stolen "sensitive information, including grievances and settlements", why Plaintiff would simply discard and destroy the information virtually immediately after it was taken.

43. The Philadelphia Police failed to interview any Union Officials other than Defendants, to obtain evidence regarding whether or not the June 27, 2012 incident, indicated criminal activity, in its opinion.

44. Based on persistent pressure from Defendants Ivey and Tillery, the Philadelphia Police chose to criminally charge Plaintiffs.

45. On/around November 15, 2012, Detective Holman issued an Affidavit of Probable Cause; thereafter, the Philadelphia District Attorney's Office charged Plaintiffs with the crimes of "Theft by Unlawful Taking of Movable Property (value of less than $50.00) , Receiving Stolen Property, and Conspiracy for Theft by Unlawful Taking of Movable Property."

46. On November 20, 2012, Detective Brown, with other members of the Philadelphia Police Department appeared at Plaintiffs' place of work at 7500 Lindbergh Avenue, Philadelphia, PA; he/they informed the Postal Police that they had arrest warrants for Plaintiffs.

47. On November 20, 2012, in response to the direction of the Philadelphia Police, Postal police escorted Plaintiff Casselli. out of his place of work, in the presence of numerous of his coworkers, and delivered him to Detective Brown and other members of the Philadelphia Police Department, thereafter members of the Philadelphia Police Department roughly handcuffed him in front of the building, causing him physical pain, including manipulation of his shoulder.

48. Plaintiff Casselli was handcuffed behind his back and was roughly shoved into the back of a police wagon/van and made to sit on a bench with no restraints where he was transported to the 25th Police District; During the ride, Plaintiff shifted in the van causing him to suffer extreme pain and he also suffered pain and discomfort in his shoulder, back, hips and his wrists.

49. After his arrival at the precinct, Plaintiff Casselli was placed in a cell with several other arrestees; while he was in the cell, an altercation broke out between several of the arrestees, at which time, Plaintiff, who was minding his business, was pushed into a metal rail within the cell, injuring his

back, hip, torso and arm; Plaintiff alerted the police at the time, that he was injured, and needed medical assistance, however, his request was ignored by the Police.

50. Plaintiff was arraigned and given bail of $2,500.00, which he was able to post from a relative, however, nobody was able to come pick him up; Plaintiff requested from the Police to use the telephone to call someone to pick him up, which the Police refused, despite the fact that he told the Police, that he had no money and did not know how to find his way from this location; the police ignored him, and simply indicated that he needed to leave the precinct; upon belief, the police deliberately wanted Plaintiff to be placed in a dangerous predicament, by leaving him stranded in a high crime area, at around 2:25 a.m.; Plaintiff Casselli had spent around 16 hours in jail.

51. Plaintiff went outside at approximately 2:25 a.m., and was able to flag down a cab; he explained that he had no money and was injured., and a sympathetic cab driver allowed him to ride on credit, until he could get back to his place of employment to obtain his car – while Plaintiff was incarcerated, his children did not know where he was, as he had no way to inform them; the children suffered extreme emotional distress from not knowing were Plaintiff was, as he is their custodial parent, and they believed he may have been in an accident (Plaintiff, a single parent, is normally home to greet them in the afternoon after school).

52. From the time of his injury in the Police District cell, Plaintiff continues to suffered extreme pain and suffering in his back, shoulder and hip for which he has obtained continuous medical treatment, and for which he has had to take off numerous days of work; his physician has also recommended that he have back surgery, however, Plaintiff cannot afford to take time off of work for the recovery period, and he also fears possible complications from such a surgery, after being informed of the risks associated with such a surgery.

53. Plaintiff Love was not at work on November 20, 2012, however he heard that the Philadelphia Police had a warrant for his arrest, and turned himself in on November 22, 2012, when he

was arrested and incarcerated for around 17 hours before he was arraigned and released; Plaintiff Love had no criminal history or arrests prior to this arrest.

54. Plaintiffs were summoned for trial on January 14, 2013, at the Municipal Court of Philadelphia; at that time, after conferring with counsel, the Court sternly questioned the validity of the charges, and its jurisdiction to hear a matter, involving federal jurisdiction, suggesting that no crime had been committed and that the District Attorney should consider withdrawing all charges against Plaintiffs; shortly thereafter, the District Attorney withdrew all charges.

55. Thereafter, between the date of the trial referred to above and May 3, 2013, Plaintiff Casselli had all of the criminal charges against him, expunged, including from the Pennsylvania Registry.

56. From the time of the alleged incident on June 27, 2012, to the present, Defendants Ivey and Tillery, have persisted in a pattern of telling numerous Union officials and Union members at Plaintiffs' place of employment, and within their union, that they have committed crimes, including theft and burglary and breaking and entering, even after all charges had been dismissed, and even after Plaintiff Casselli has had all charges expunged and it has been legally determined that no crime was committtted; this included at Union Meetings on November 1, 2012, June 13, 2013, June 20, 2013, August 23, 2013.

57. Detective Holman and Detective Brown, and the other members of the Philadelphia Police Department knew that there was not probable cause that Plaintiffs had committed the crimes for which they were arrested and charged; On the day of Plaintiff Casselli's arrest, Detective Brown told him essentially, that the charges were bogus, and that that after he was exonerated, that he should sue his Union and Defendant Ivey and others involved in having him arrested; he also stated that the case had been sitting around with the Police since around July, however the Police bent to the pressue of Defendant Ivey to make arrests

58. There was no physical evidence of a forced entry; there was no evidence of any particular

item belonging to Defendants Ivey or Tillery, or any other union member being stolen (or missing); Plaintiffs had the right to enter their Union Office, for which they pay dues and to obtain their own property, which they had left from their prior administration.

59. Defendants Ivey and Tillery have acted with malice to harm Plaintiffs, by slandering and libeling them as criminals, to harm their personal and professional reputations withing the Postal Service, and within their Union, for the motive of destroying their reputations, to crush their political opposition and out of personal animus.

60. On June 13, 2013, Defendant Ivey and Tillery held a Union General Membership Meeting, at which time they stated and documented that the "Membership" accepted and approved three judicial decisions regarding charges against Plaintiffs, and a shop steward, for "taking and destroying Union records on June 27, 2012 after "breaking into a file cabinet assigned to Laura Tillery" - such statement was materially false.

61. As a result of Defendant Ivey's and Tillery's knowingly false statements, they were able to orchestrate sixty days suspensions against Plaintiffs, from APWU.

62. As a result of Defendant Ivey's and Tillery's false statements, they were able to convince Mr. Reeves, the Hearing Officer, to recommend that Plaintiffs be found guilty of theft of Union documents, disrupting and interfering with Union business, "breaking into locked file cabinet", and recommending a union suspension of 60 days to three years., stating that the factual allegations were accepted by the Philadelphia Area Local Executive Board; copies of the statements made above were disseminated at the Union Hall, where all union members could read them; the date that Mr. Reeves signed off on the decision, came after he had officially left his office.

63. Upon information and belief, Defendants Tillery and Ivey orchestrated the writing and production of a flyer that was disseminated at Plaintiffs' place of employment, referring to Plaintiff Casselli as an "ex-convict", "who should not be allowed to work at the Post Office let alone around

normal citizens."

64. Detective Brown told Plaintiff Casselli, that Defendant Ivey had pressed the Police to arrest Plaintiffs; the Police knew that they did not have probable cause to arrest Plaintiffs, including based on the statements of the Postal Police, including that of its Sgt. A.D. Wilson, who indicated that no crime had been committed, and that the alleged incident was an internal postal matter.

65. During the time that Plaintiff Casselli was president of the union local chapter in 2011 and thereafter, according to the Collective Bargaining Agreement, the Union was responsible to pay for his health insurance, life insurance and retirement benefits.

66. On/around April 29, 2013, the Postal Service received a bill for Plaintiff Casselli's medical treatment for the time he was president, in the amount of $3,686.94; from that time to the present, the Union and Defendant Ivey have refused to honor the CBA and pay the bill, rather it was sent to Plaintiff Casselli and he was informed him that he must pay the bill; The Postal Service refused to honor the CBA by issuing the bill to Plaintiff Casselli and demanding he pay.

67. Thereafter, the Postal Service, upon the information provided to them by Defendant Ivey and the Union, informed Plaintiff Casselli that it would pay the debt from his pay, by taking out $226.99 per pay period (around 17 pay periods) until the bill is satisfied; APWU refused to pay for the benefits described above on behalf of Plaintiff Casselli; to date APWU has also refused to pay Plaintiff Casselli for five days of vacation time.

68. Defendant Keenan made knowingly false statements about what he allegedly witnessed on June 27, 2012, including that force was used to open the cabinet; he made at least three statements regarding the events that evening, all of which contain inconsistent statements.

FIRST CAUSE OF ACTION – 42 U.S.C S 1983 AS TO THE CITY O F PHILADELPHIA

AND THE POLICE DEFENDANTS

69. Plaintiff incorporates paragraphs 1-68 above as though fully set forth herein by reference.

70. As a direct and proximate result of the Defendants' conduct, including that the City of Philadelphia and its' Police Department and Police Officers, which was committed under color of state law, Plaintiff were deprived of their rights to be free from false arrest, unreasonable and excessive force, unlawful search and seizure, false imprisonment, deliberate indifference to the need for medical treatment. Plaintiffs suffered violation of his rights under the laws and Constitution of the United States, in particular, the Fourth and Fourteenth Amendments thereof, and 42 U.S.C. S 1983. As a direct and proximate result of the acts of the Defendants, Plaintiff Casselli suffered and continues to suffer physical pain and suffering, severe emotional distress, loss of enjoyment of life, and economic loss, all to his detriment and harm.

71. As a direct and proximate result of the acts of the Defendants, Plaintiff Love suffered and continues to suffer severe emotional distress, loss of enjoyment of life, and economic loss all to his detriment and harm.

72. Defendant the City of Philadelphia has encouraged, tolerated, ratified and has been deliberately indifferent to the following police patterns, practices and customs and to the need for more or different training, supervision, investigation or discipline in the areas of:

 a. Intentionally falsely arresting persons with the knowledge that they do not have sufficient evidence to satisfy probable cause, and conspiring to have such citizens arrested with misleading, unreliable, specious and/or stale evidence, upon their malicious desire to make arrests, and/or for other reasons unrelated to effectuating justice;

 b. The use of unreasonable force, including roughly handling and handcuffing alleged suspects who have not presented any physical danger to the public, simply because they are accused or suspected of committing any form of crime;

 c. The use of unreasonable force, including potentially deadly force, excessive force and unlawful seizure by police;

d. The proper exercise of police powers, including, but not limited to the unreasonable use of force, the use of excessive force, and unlawful seizure;

e. The monitoring of police officers whom it knew or should have known were suffering emotional and/or psychological problems which impairs their ability to function as officers;

f. The failure to identify and take remedial or disciplinary action against police officers who were subject to prior civilian or internal complaints of misconduct:

g. Police officers' use of their status as police officers to selectively provide false and misleading evidence to the Philadelphia District Attorney's Office and the Courts to attempt to ensure convictions and/or false imprisonment pending preliminary hearings and/or trials, against persons whom they selectively desire to be punished, including ex-convicts, or persons with prior arrests, who have served their sentences, persons whom they have either previously arrested, or simply have stereotyped as being criminals.

h. unlawful arrests, including those made to achieve ends not reasonably related to their police duties;

73. The City of Philadelphia failed to properly sanction or discipline officers who it is aware that they aid and abet violations of Constitutional rights of persons by other Philadelphia Police Officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Plaintiffs.

74. Defendants have by the above described actions, deprived Plaintiffs of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. S 1983.

WHEREFORE, Plaintiffs request judgment in their favor as to all Defendants, jointly and severally and request the the following relief:

a. compensatory damages;

b. punitive damages;

    c. reasonable attorney's fees and costs;

    d. such other relief as the Court deems appropriate and just;

    e. a jury trial.

## SECOND CAUSE OF ACTION - SUPPLEMENTAL STATE LAW CLAIMS AS TO POLICE OFFICER DEFENDANTS

75. Plaintiff incorporates paragraphs 1-74 above as though fully set forth herein.

76. The acts and conduct of the City of Philadelphia Police Officers named in the caption above, and the currently unnamed and unknown police officers in this case constitute assault, battery, malicious prosecution, false imprisonment, defamation, false light privacy contract under the laws and/or common law of the Commonwealth of Pennsylvania and this Court has supplemental jurisdiction to hear and adjudicate these claims.

WHEREFORE, Plaintiffs request judgment in their favor as to all Defendants, jointly and severally and request the the following relief:

    a. compensatory damages;

    b. punitive damages;

    c. reasonable attorney's fees and costs;

    d. such other relief as the Court deems appropriate and just;

    e. a jury trial.

## THIRD CAUSE OF ACTION – MALICIOUS PROSECUTION AS TO THE APWU DEFENDANTS

77. Plaintiffs incorporate paragraphs 1-76 above as though fully set forth herein.

78. The acts and conduct Defendants APWU Ivey, Tillery and Keenan constitute malicious prosecution under the Commonwealth of Pennsylvania and this Court has supplemental jurisdiction to hear and adjudicate these claims; The individual Defendants were acting in their agency capacities as

officers of APWU at the time of their acts.

79. All Defendants named in paragraph 78 above made statements to the Philadelphia Police for the purpose of initiating criminal proceedings against Plaintiffs, when they knew that Plaintiffs had not committed crimes, particularly theft, breaking and entering, and burglary – they knew their was no probable cause of crimes; Defendants statements were made with the knowledge of their falsity or with reckless indifference as to their truthfulness, and were done maliciously to harm Plaintiffs.

80. Plaintiffs were criminally prosecuted from the time of their arrests on November 20 and November 22, 2012, until all charges against them were dismissed on January 14, 2013.

81. Plaintiffs suffered the harm described above in this Complaint and deprivation of their liberty.

WHEREFORE, Plaintiffs request judgment in their favor as to all Defendants, jointly and severally and request the following relief:

    a. compensatory damages;

    b. punitive damages;

    c. any other relief the court deems appropriate.

## FOURTH CAUSE OF ACTION - DEFAMATION AS TO THE APWU DEFENDANTS

82. Plaintiffs incorporate paragraphs 1-81 above as though fully set forth herein.

83. The acts of Defendants APWU, Gwen Ivey Laura Tillery and Frank Keenan constitute defamation, libel and slander.

84. At all times relevant to the averments of the complaint, the individual APWU Defendants were acting on behalf of APWU as agents for it, in their official positions.

85. Between November 2012 to the present, Defendants repeatedly, intentionally stated that Plaintiffs had stolen Union property, broken and entered a Union cabinet, destroyed Union

material, and burglarized the Union; this information was published to Union Officials and numerous of its members, at Union Meetings, to Postal Management and to the Philadelphia Police.

86. Defendants statements have a defamatory meaning, and the statements were applied to Plaintiffs by the Defendants.

87. The recipients of the false statements understood their defamatory meaning, including criminal activity, and that they applied to Plaintiffs.

88. Plaintiffs suffered special harm from Defendants knowingly false statements or statements made with reckless disregard as to their truth, including economic loss and loss of their personal and professional reputations.

89. Defendants were not privileged to make the false statements.

WHEREFORE, Plaintiffs request judgment in their favor as to all Defendants, jointly and severally and request the following relief:

a. compensatory damages;

b. punitive damages;

c. any other relief the Court deems appropriate.

FIFTH CAUSE OF ACTION – INVASION OF PRIVACY – FALSE LIGHT PRIVACY

AS TO THE APWU DEFENDANTS

90. Plaintiffs incorporate paragraphs 1-89 above as though fully set forth herein.

91. Between June 27, 2012 up to the present, the APWU Defendants identified above have intentionally made knowingly false statements, or statements made with reckless disregard for their truth about Plaintiffs, including, but not limited to allegations that they committed crimes, including theft of Union property, breaking and entering and that Plaintiff Casselli is a criminal.

92. Defendants Ivey, Tillery and Keenan were acting in their official capacities as Union officers when they made the statements described and summarized above .

93. Defendants false statements were published widely throughout the Postal Service, including to Union personnel and other Postal personnel, including its management.

94. Defendants statements are highly offensive under a reasonable person standard, because they falsely depict Plaintiffs as criminals, and non desirable persons, and they also place into question their future qualifications for Union officership.

WHEREFORE, Plaintiffs request judgment in their favor as to all Defendants, jointly and severally and request the following relief:

    a. compensatory damages;

    b. punitive damages;

    c. any other relief the Court deems appropriate.

## SIXTH CAUSE OF ACTION – BREACH OF CONTRACT AS TO APWU AND THE UNITED STATES POSTAL SERVICE

95. Plaintiffs incorporates paragraphs 1-94 above as though fully set forth herein.

96. Plaintiff Casselli is the former President of APWU, and as a part of the Collective Bargaining Agreement (CBA) between it and the United States Postal Service (USPS), he was entitled to have his health insurance, life insurance and retirement benefits paid for by Defendant APWU for the time that he was President of APWU.

97. Despite the contract described above, in/around April 2013 and thereafter, Defendant USPS refused to abide by the CBA, and sent notice to Plaintiff that he must pay medical bills in excess of five thousand dollars, and later in excess of three thousand dollars; thereafter in/around August 2013, it began taking approximately $226.00 per pay period, from Plaintiff's paychecks to satisfy the medical bills.

98. Plaintiff complained of the facts described above to Defendant APWU, which refused to pay the bills on his behalf, in violation of the CBA.

WHEREFORE, Plaintiff Casselli requests judgment in his favor against Defendants the United States Postal Service and APWU, jointly and severally and requests the following:

a. all economic loss from their respective breaches;

b. reimbursement of all monies taken from him for the medical bills;

c. an order that Defendants perform the contracts;

d. any damages resulting from Defendant's respective breaches;

e. any other relief the Court deems appropriate.

Respectfully Submitted,

Reginald Allen, Esquire